Filed 4/2/18

# IN THE SUPREME COURT OF CALIFORNIA

<table>
<tr><td>In re ROY BUTLER<br><br>on Habeas Corpus.</td><td>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)</td><td>S237014<br><br>Ct.App. 1/2 A139411<br><br>Alameda County<br>Super. Ct. No. 91694B</td></tr>
</table>

People convicted of noncapital murder and certain other criminal offenses in California serve indeterminate sentences that run from a minimum number of years to life, making release possible before the end of their life.  The Board of Parole Hearings (the Board) decides, subject to relevant statutory provisions and review by the Governor, whether such prisoners are suitable for release.  This case concerns the interaction of those statutory provisions with a settlement agreement arising from litigation about the Board's procedures.  While serving an indeterminate prison term, Roy Butler filed a petition for writ of habeas corpus on December 12, 2012, alleging in part that the Board had a responsibility to avoid parole determinations leading to grossly disproportionate prison terms.  In 2013, petitioner Roy Butler and respondent, the Board, agreed to a settlement requiring the Board to calculate the "base terms" of an inmate serving an indeterminate sentence for use at the inmate's initial parole hearing.  At the time of the settlement agreement, "base terms" governed the earliest possible release date for inmates serving indeterminate sentences.  Since then, changes to California's

1

criminal justice system have altered the relevant statutory landscape, such that "base terms" no longer govern the release date of inmates subject to indeterminate sentences.

The question before us is whether those statutory developments warrant modification of the settlement order to relieve the Board of any separate obligation to calculate "base terms" under the agreement. The Court of Appeal concluded the answer was no, so the settlement order could remain in force despite the statutory changes. We disagree. The settlement agreement was premised on the idea that "base terms" played some role — defined by statute — in determining release dates for those sentenced to indeterminate terms. Given this premise, the elimination of "base term" calculations from any such role is a sufficiently material change that it not only justifies — but in this case, requires — modification of the settlement by the Court of Appeal.

The Court of Appeal also concluded that specific "base term" calculations were necessary to assure life prisoners would not suffer constitutionally excessive punishment. Here too, we differ with the appellate court. Base term calculations no longer play a role in the public safety assessments undertaken by the Board to determine the release dates for inmates sentenced to indeterminate terms, and are not designed or obviously well-suited as a tool for avoiding unconstitutionally long terms of incarceration. And, at least to some extent, these inmates are protected against disproportionate punishment through other means, such as provisions ending indeterminate sentences when individuals have served the statutory minimum term and have been found suitable for release. In light of the state's current sentencing regime and the existence of parole procedures focusing on public safety determinations, the Board is not constitutionally required to continue calculating base terms as required in the settlement order. Accordingly, we reverse the Court of Appeal.

2

## I.

Petitioner Roy Butler was convicted of second degree murder in 1988. What Butler told detectives at the time of his arrest is that he and acquaintance Lanzester Hymes decided to attack Richard Davis because Davis had been abusing his girlfriend Jane Woods, a friend of Butler's. On September 28, 1987, Butler and Hymes armed themselves with knives and went to the apartment that Davis, Hymes, and Woods shared. According to Butler, he was hiding inside the bathroom when Hymes fatally stabbed Davis. After Butler pleaded guilty, he received a sentence of 15 years to life. Butler became eligible for parole in 1997, but the parole authority denied his application for parole at that hearing and at several subsequent hearings. After the Board denied his application at a hearing in February 2012, Butler filed a petition for writ of habeas corpus, which led to the case before us.

Prior to 1977, California used an "indeterminate" sentencing regime for the vast majority of felonies. (*In re Dannenberg* (2005) 34 Cal.4th 1061, 1077 (*Dannenberg*).) Under this system, courts "imposed a statutory sentence expressed as a range between a minimum and maximum period of confinement — often life imprisonment — the offender must serve." (*Ibid.*) The state agency in charge of parole (then called the Adult Authority) had exclusive control over the period of incarceration the inmate actually served, so inmates had no idea when they would be released. (*Id.* at pp. 1077, 1089.)

The state largely abandoned this system when it adopted a mostly "determinate" sentencing regime in 1976. (*Dannenberg*, *supra*, 34 Cal.4th at p. 1078.) Now, most felonies are subject to defined terms of confinement. But certain serious offenses, including noncapital murder, remain subject to

3

indeterminate sentences. (*Ibid.*)[1] The sentence of 15 years to life Butler received in 1988 is an example of this type of punishment. For inmates serving indeterminate sentences, the parole authority (now called the Board of Parole Hearings) continues to determine the end of their period of incarceration via a determination that the inmate is suitable for parole. (See generally Pen. Code, § 3041.)[2] The standard for parole suitability is whether the inmate "will pose an unreasonable risk of danger to society if released from prison." (Cal. Code Regs., tit. 15, § 2281, subd. (a).)

When this action commenced, a previous version of section 3041 governed the Board's authority to set release dates for indeterminately-sentenced offenders. (Former § 3041; see also *Dannenberg*, *supra*, 34 Cal.4th at pp. 1078-1079 [describing this version of the statute].) Subdivision (a) of that statute directed the Board to set parolees' release dates "in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public." (Former § 3041, subd. (a).) The statute further directed the Board, when setting release dates, to "consider the number of victims of the crime . . . and other factors in mitigation or aggravation of the crime." (*Ibid.*)

To implement this duty, the Board adopted regulations for each indeterminate sentence offense. These regulations expressly rely on and reference section 3041 as enabling authority. (See, e.g., Cal. Code Regs., tit. 15, §§ 2280 [listing section 3041 as a statutory reference], 2400 ["This article implements

---

[1]     Indeterminate sentences of life imprisonment are also authorized for some felonies less serious than murder under, for example, the Three Strikes Law. (See Pen. Code, §§ 667.5, subd. (e)(2)(A), 1170.12, subd. (c)(2)(A); see also, e.g., *id.*, §12022.53, subd. (d) [25 years-to-life enhancement for causing great bodily injury or death by discharge of firearm in course of certain felonies].)

[2]     All subsequent statutory citations are to the Penal Code, unless otherwise noted.

Penal Code section 3041"].)  One such set of regulations applies to noncapital

murder committed on or after November 8, 1978.  (*Id.*, § 2400 et seq.;

*Dannenberg*, *supra*, 34 Cal.4th at pp. 1078-1079.)  Under the regulations, the

Board is required to "set a base term for each life prisoner who is found suitable

for parole."  (Cal. Code Regs., tit. 15, § 2403, subd. (a).)  In accordance with the

regulations, the Board must determine that an inmate is suitable for parole *before*

setting that inmate's base term.  (*Id.*, § 2402, subd. (a) ["The panel shall first

determine whether the life prisoner is suitable for release on parole"]; see also

*Dannenberg*, *supra*, 34 Cal.4th at pp. 1079-1080.)

A base term is calculated using matrices that appear in said regulations.

For murder, the matrix's horizontal axis presents general descriptions of the cause

of the victim's death.[3]  The vertical axis lists possible descriptions of the

relationship between the inmate and victim.[4]  The first step in calculating the base

term is to determine which intersection of the horizontal and vertical axes is "most

closely related to the circumstances of the crime."  (Cal. Code Regs., tit. 15,

§ 2403, subd. (a).)  Each intersection then lists three alternative sentences — a

lower, middle, and upper base term.  For example, a second degree murder

committed after November 8, 1978, through a "Direct" mechanism and against a

victim with whom the inmate had a "Prior Relationship" would yield base term

alternatives of 17, 18, or 19 years.  (*Id.*, § 2403, subd. (c).)  The Board's

---

[3]    For example, the categories on the horizontal axis of the matrix for second
degree murders committed after November 8, 1978, range from "Indirect" (e.g.,
"shock producing heart attack") to "Direct or Victim Contribution" (e.g., "[d]eath
was almost immediate") to "Severe Trauma" (e.g., "beating, clubbing").  (Cal.
Code Regs., tit. 15, § 2403, subd. (c).)

[4]    Here, the categories for second degree murder committed after November
8, 1978, range from "Participating Victim" (e.g., "[v]ictim was accomplice") to
"Prior Relationship" to "No Prior Relationship."  (Cal. Code Regs., tit. 15,
§ 2403, subd. (c).)

regulations require it to select the middle term unless it finds circumstances in mitigation or aggravation (as defined elsewhere in the regulations). (*Id.*, § 2403, subd. (a).) A finding that mitigating circumstances exist leads to the selection of the lower base term, while a finding of aggravating circumstances leads to the selection of the upper base term. (*Id.*, §§ 2404, subd. (a), 2405, subd. (a).) The Board then modifies an inmate's base term for any enhancements related to the offense (such as use of a firearm), leading to the inmate's so-called "adjusted base term." (*Id.*, § 2406.)

Under this version of the regulatory scheme, the Board begins its assessment of an inmate's earliest possible release date by calculating his or her adjusted base term. These regulations allow the Board to then postpone the release date if the inmate has other convictions (Cal. Code Regs., tit. 15, §§ 2407-2409) or to advance it for any postconviction credits the inmate has received. (*Id.*, § 2410.) It is this final date that determines when an inmate found suitable for parole may be released. Under these regulations, a parolee cannot be released until the inmate has served at least this amount of time. (*Id.*, § 2411, subds. (a), (b); see also *In re Vicks* (2013) 56 Cal.4th 274, 313.)

In 2012, Butler filed a petition in propria persona for writ of habeas corpus in the First District Court of Appeal. (*In re Butler* (2015) 236 Cal.App.4th 1222, 1227-1228.) Among other contentions, Butler argued that the Board violated the state and federal Constitutions through its policy of deferring the calculation of an inmate's base term until it found the inmate suitable for parole. (*Ibid.*) The Court of Appeal appointed counsel who assisted Butler in filing a supplemental habeas petition. (*Id.* at p. 1228.) The supplemental petition reiterated Butler's constitutional argument and added a separate claim arguing that insufficient evidence supported the Board's denial of parole in Butler's case. (*Id.* at p. 1228 & fn. 2.) The Court of Appeal bifurcated the action into two separate cases; one

6

concerned whether sufficient evidence supported denial of parole in Butler's case, while the other addressed the constitutionality of deferring base term calculations. (*Ibid.*) The Court of Appeal eventually issued orders to show cause in both cases. (*Id.* at p. 1228.)

In the case dedicated to Butler's challenge of the Board's determination that he was unsuitable for parole, the Court of Appeal ultimately granted habeas corpus relief.[5] (*In re Butler*, *supra*, 236 Cal.App.4th at p. 1228, fn. 2.) On remand, the Board vacated its earlier denial of parole and held a new hearing at which it found Butler suitable for parole. (*Ibid.*) The Governor did not intervene, so Butler was released on parole in June 2014.[6] (*Ibid.*)

In the meantime, the parties began settlement negotiations in the case addressing Butler's claim that the Board violated his constitutional rights by declining to calculate his base term. (*In re Butler*, *supra*, 236 Cal.App.4th at pp. 1228-1229.) The parties eventually agreed to a settlement in December 2013 that required the Board to calculate an inmate's base and adjusted base terms at the inmate's initial parole hearing (or, for inmates who already had their initial hearing, at the inmate's next scheduled parole hearing). The stipulated order also required the Board to amend its regulations to codify this new approach. The Court of Appeal retained jurisdiction over the case until the amended regulations

---

[5] We ordered to depublish the Court of Appeal opinion granting Butler habeas corpus relief. (*In re Butler*, S217457, Supreme Ct. Mins., June 11, 2014.)

[6] For good reason, neither side argues that this case became moot once Butler was released. The parties agreed to settle Butler's suit regarding base term calculations before Butler was released. Thus, his subsequent release has not mooted this action. A judgment is not moot if it "affects [the parties'] rights in the future." (*Eye Dog Foundation v. State Board of Guide Dogs for Blind* (1967) 67 Cal.2d 536, 542.) The settlement continues to bind the Board and thus affect its future rights and obligations.

7

became effective.[7]  Later, the Court of Appeal granted Butler's request for attorney fees under Code of Civil Procedure section 1021.5.  (*Butler*, 236 Cal.App.4th at p. 1230.)  The attorneys' fees opinion discussed in some detail the Court of Appeal's theory about the constitutional significance of base terms.  (*Id.* at p. 1235-1245.)  The Board did not petition for review.

In the years since the parties settled the case before us, legislators and the electorate made major changes to California's criminal justice system.  Three of those changes are potentially relevant to the issues before us.  First, Senate Bill No. 260 became effective on January 1, 2014.  (Stats. 2013, ch. 312.)  Under this law, inmates who committed indeterminate sentence offenses before turning 18 years old would "be paroled regardless of the manner in which the [B]oard set release dates pursuant to subdivision (a) of Section 3041."  (§ 3046, subd. (c).) The result is that youth offenders are released once found suitable for parole, regardless of the minimum sentence that the offender's base term would otherwise provide.  In 2018, the Legislature extended the benefits of Senate Bill No. 260 to inmates who committed offenses at 25 years of age or younger.  (Stats. 2017, ch. 675.)

Second, the Board altered its treatment of certain elderly inmates to comply with a February 2014 federal court order.  (See *Plata v. Brown* (N.D. Cal. Feb. 10, 2014, No. 3:01-cv-01351-JST).)  The order required the Board to "[f]inalize and implement" new parole procedures for inmates who are at least 60 years old and who have served sentences of 25 years or more.  (*Id.* at p. 3 ¶4(e).)  In response, the Board announced expedited parole hearings for those elderly inmates who

---

[7]     The Board has never promulgated the regulations that it agreed to enact in the settlement.  After the Board filed its petition for review, the Court of Appeal stayed the Board's rulemaking obligations under the settlement agreement.

have served a minimum of 25 years and a new policy of considering an inmate's advanced age, long-term confinement, and diminished physical condition in determining their suitability for parole. (See Board of Parole Hearings, Cal. Dept. of Corrections and Rehabilitation, Elderly Parole Program (June 16, 2014) p. 2.)[8] Accordingly, as of June 2014, elderly inmates are also paroled upon a finding of suitability, regardless of what limit base terms would otherwise impose on the inmates' release dates.

Third — and most significantly — the Legislature enacted Senate Bill No. 230 in 2015. (Stats. 2015, ch. 470.) This legislation excised the language from former section 3041, subdivision (a) requiring the Board to set parolees' release dates "in a manner that will provide uniform terms for offenses of similar gravity and magnitude with respect to their threat to the public" — the very language on which the Board relied in devising the base term system. Senate Bill No. 230 provided instead that "[u]pon a grant of parole, the inmate shall be released subject to all applicable review periods. However, an inmate shall not be released before reaching his or her minimum eligible parole date as set pursuant to Section 3046." (§ 3041, subd. (a)(4); Stats. 2015, ch. 470, § 1.) In turn, section 3046 provides that an inmate shall not be released until the inmate has served the greater of (1) seven years, or (2) a minimum term set by relevant statute, if one exists.[9] (§ 3046, subd. (a).) Because of this legislation, base terms no longer control the release date for nonyouthful, nonelderly inmates either. Instead, those inmates' indeterminate terms end when the inmate is both (1) found suitable for parole and (2) has served

---

[8] The Legislature recently codified these procedures under the Elderly Parole Program. (See Pen. Code, § 3055.)

[9] For example, the minimum term for second degree murder is either 15, 20, or 25 years, depending on the circumstances of the offense. (§ 190, subds. (a), (b), (d).)

9

their statutory minimum term (subject, of course, to the Board's internal review procedures and the Governor's power to reverse a grant of parole or request further review (see §§ 3041, subd. (b), 3041.1, 3041.2)).

The most important aspect of these changes, for present purposes, is that base terms no longer play a defined role in determining the release date for *any* inmate sentenced to an indeterminate term.

After SB 230 went into effect in January 2016, the Board moved to modify the December 2013 settlement agreement. According to the Board, it should be relieved of its obligations to calculate base terms and promulgate new regulations for calculating base terms at an inmate's initial parole hearing. In essence, the Board argued that changes to the statutory scheme eliminated the Board's authority or need to calculate base terms. The Court of Appeal denied the motion. It declined to modify the settlement order on the basis that the order "does not conflict" with any subsequent changes to the parole hearing process. The court also reasoned that the calculation of base terms was necessary to "assure life prisoners will not suffer constitutionally excessive punishment."

We granted the Board's petition for review.[10] We must now decide whether the changes discussed above are sufficiently material to require modification of the Board's obligations to calculate inmates' base terms.

---

[10] Butler argues we should dismiss our grant of review to penalize the Board for, according to Butler, willfully violating the settlement order. (See *Gwartz v. Weilert* (2014) 231 Cal.App.4th 750, 757 ["An appellate court has the inherent power to dismiss an appeal by a party that refuses to comply with a lower court order"].) He also asserts that modification of the consent decree would violate the law of the case doctrine. (See *People v. Gray* (2005) 37 Cal.4th 168, 196 [explaining that the law of the case doctrine "generally precludes multiple appellate review of the same issue in a single case"].)

Butler failed, however, to preserve these issues for our consideration. He did not file a petition for review or assert in his answer to the Board's petition that

## II.

The parties' settlement in this case was given effect in an injunctive order over which the Court of Appeal retained jurisdiction. Courts retain power to vacate or modify such orders at any point. (See *Sontag Chain Stores Co. v. Superior Court* (1941) 18 Cal.2d 92, 94-95 (*Sontag Chain Stores*) [an injunctive order, "it has uniformly been held, is always subject, upon a proper showing, to modification or dissolution by the court which rendered it"]; see also *Union Interchange, Inc. v. Savage* (1959) 52 Cal.2d 601, 604 (*Union Interchange*) ["When the decree is continuing in nature, directed at future events, it must be subject to adaptation as events may shape the need"].) A court may "modify or dissolve an injunction . . . upon a showing that there has been a material change in the facts upon which the injunction . . . was granted, that the law upon which the injunction . . . was granted has changed, or that the ends of justice would be served by the modification or dissolution of the injunction." (Code Civ. Proc., § 533.) When a lower court rules on a motion to modify or vacate an injunctive order, we review it for abuse of discretion. (*Salazar v. Eastin* (1995) 9 Cal.4th 836, 850 (*Salazar*).) Under this standard, we consider the court's legal conclusions de novo, and assess its factual findings for substantial evidence. (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711.) We will not reverse the court's application of the law to the facts unless it is "arbitrary and capricious." (*Id.* at p. 712.) When a court decides not to modify an order despite a material change in the law fundamentally undermining the presumptions underlying the parties' acceptance of a settlement agreement, its decision ordinarily constitutes an abuse

we should address these issues. (See Cal. Rules of Court, rule 28.1(c).) It is true that Butler did raise them in his answer to the petition for review, but only as a reason why the case did not warrant our review. Bringing up such an issue in this manner does not adequately preserve it for our review. (See *Scottsdale Ins. Co. v. MV Transp.* (2005) 36 Cal.4th 643, 654, fn.2.)

of discretion. (See *Welsch v. Goswick* (1982) 130 Cal.App.3d 398, 408-409 [holding that the trial court abused its discretion in failing to modify a stipulated injunctive order following a material change in the law].)

Whether changes in the law or circumstances affecting this case *require* modification of the injunctive order is a question sharply dividing the parties. Postsettlement changes to California's criminal justice system are at issue here, principally the fact that base terms no longer directly control the release date for indeterminately-sentenced inmates. The Board argues that these changes are sufficiently material because they have "emptied base terms of any meaning and function." Butler, by contrast, argues that modification is appropriate only when an injunctive order "conflicts with or violat[es]" current law. And, Butler continues, far from conflicting with these subsequent developments, the settlement order in fact furthers their purpose of reducing the state's prison population.

The Court of Appeal did not modify the injunction order. In continuing to embrace the stipulated agreement as it stood before the recent raft of legal changes, the court observed that the agreement did not directly conflict with the new legal regime and held that the changes in the law were not sufficiently material to warrant modification. Yet in so concluding, the appellate court did not fully consider the extent to which the intervening legal changes have undermined the settlement's foundational assumptions, even if the changes fell short of creating an actual conflict with the settlement.

In its argument, the Board relies on cases involving injunctions that conflict with current law. These cases can be distinguished from what is before us. In *Salazar*, for example, the trial court entered an injunctive order barring school districts for charging fees for transportation to and from school. (*Salazar*, *supra*, 9 Cal.4th at pp. 844-845.) We later held in *Arcadia Unified School District v. State Department of Education* (1992) 2 Cal.4th 251 that charging such fees did not

12

violate the California Constitution. After our decision in *Arcadia*, the trial court vacated its injunction but the Court of Appeal reversed. (*Salazar*, 9 Cal.4th at pp. 848-849.) We later reversed the Court of Appeal, reasoning that *Arcadia* "eliminated the legal basis for the injunction." (*Salazar*, 9 Cal.4th at p. 840; see also *id.* at p. 850 ["Here, because the injunction was inconsistent with our decision in *Arcadia . . .* to vacate it was not an abuse of discretion"].) The Board also relies on *Systems Federation No. 91, Railway Employees' Department, AFL-CIO v. Wright* (1961) 364 U.S. 642. But *Systems Federation* also dealt with an injunctive order that conflicted with subsequent legal developments.

This case is different. Although the relevant statutes and regulations have changed since the settlement, the Board faces no direct conflict between the injunctive order and existing statutes. Senate Bill No. 260 and Assembly Bill No. 1308 require that youth offenders be released once found suitable for parole — irrespective of any base term calculations. (Stats. 2013, ch. 312; Stats. 2017, ch. 675.) And under the Elderly Parole Program, eligible elderly inmates who have served a minimum of 25 years may be released to parole if they are found suitable, regardless of what limit base terms would have otherwise imposed on the inmates' release dates. Finally, Senate Bill No. 230 requires that an inmate's sentence ends once he is found suitable for parole and he has served his statutory minimum term. (Stats. 2015, ch. 470.) The order does not, as in *Salazar* and *Systems Federation*, prevent the bound party from doing something that it unquestionably has a right to do under current law. Instead, it requires the Board to do something that no longer has any apparent significance under its own statutes or regulations. For this reason, we think the cases on which the Board relies are inapposite.

But neither does Butler persuade when he contends modification of a continuing injunction *requires* a conflict between the injunction and current law. To support this argument, Butler cites *Firefighters v. City of Cleveland* (1986) 478

13

U.S. 501 (*Firefighters*). Yet *Firefighters* is a federal case with no direct relevance to the question before us. It concerned a consent decree, under title VII of the Civil Rights Act of 1964, designed to remedy past racial discrimination in the City of Cleveland's fire department. (*Id.* at pp. 505-508.) What the decree required, among other things, was that the City promote a specific number of minority firefighters to management positions. (*Id.* at p. 510.) The union representing the firefighters objected, arguing that the decree violated section 706(g) of title VII, which provides that " '[n]o order of the court shall require the . . . promotion of an individual . . . if such individual was refused . . . advancement . . . for any reason other than discrimination on account of race, color, religion' " etc. (*Firefighters*, at p. 514, italics omitted, quoting 42 U.S.C. § 2000e-5 (g).)[11] The U.S. Supreme Court rejected the argument, holding that consent decrees do not qualify as " 'order[s] of the court' " under section 706(g) because parties enter into them voluntarily. (*Id.* at p. 519; *id.* at pp. 521-522.)

Also rejected by the U.S. Supreme Court was the union's contention that a consent decree can only order relief that a court could impose itself after trial. (*Firefighters*, *supra*, 478 U.S. at p. 525 [a "federal court is not necessarily barred from entering a consent decree merely because the decree provides broader relief than the court could have awarded after a trial"]; *id.* at p. 524.) The court then went on to cabin this conclusion by noting, in language that Butler cites, that courts cannot accept a consent decree that "conflicts with or violates the statute upon which the complaint was based." (*Id.* at p. 526.) Even assuming this case sheds any light on the general issue before us, the morsel of it Butler quotes —

---

[11] The thrust of the union's objection was that the consent decree would require the City to promote some minority firefighters who had not themselves been denied a promotion for discriminatory reasons. (*Firefighters*, *supra*, 478 U.S. at p. 514.)

read in context — does not announce a standard for modification of an injunctive order. In light of the case's procedural posture, it is quite clear the *Firefighters* court simply reiterated a more general principle underlying injunctive relief:  that consent decrees should be consistent with governing law.

Contrary to what Butler's contention implies, flexibility is a touchstone of a court's power to modify an injunctive order. (See Code Civ. Proc., § 533 [allowing for modification based on "a material change in the facts" or even simply because "the ends of justice would be served by the modification"]; see also *Sontag Chain Stores*, *supra*, 18 Cal.2d at p. 95 [describing courts' power to modify injunctive orders as "an inherent one," the exercise of which "is determined by the facts and circumstances of each particular case, with a view to administering justice between the litigants"].) Of course, statutory changes having only a tenuous bearing on a settlement agreement do not necessarily give rise to a requirement to modify the agreement. (See *Professional Engineers v. Department of Transportation* (1997) 15 Cal.4th 543, 574 [holding that the trial court did not abuse its discretion when it failed to modify the initially-imposed terms of an injunction despite subsequent legislative changes].) Where modification of a consent decree is neither foreclosed because of constitutional considerations nor required because of sufficiently important changed circumstances, a court with jurisdiction over a consent decree has discretion to decide whether to modify the consent decree in light of the particular circumstances of the case. Given the nature and extent of statutory changes at issue, however, the relevant inquiry is therefore whether the statutory changes made since entry of the stipulated judgment are sufficiently material not only to permit, but in this case to require, modification of that judgment. (*Sontag Chain Stores*, *supra*, 18 Cal.2d at p. 95.) In arguing that they are, the Board cites three changes:  new rules for youth offenders (Senate Bill No. 260 and Assembly Bill No. 1308); the federal court

15

order relating to elderly inmates; and Senate Bill No. 230, which eliminated the statutory language on which the Board relied in devising base terms.

Changes of such magnitude are consequential enough to require the settlement agreement's modification. Although the new sources of law differ in certain details,[12] all three are similar in establishing parole regimes that do not rely on an inmate's base term. Together, they create a new legal landscape wherein base terms no longer play a defined role in the Board's determination of parolee release dates. This is no trifling change. The terms to which the Board agreed in 2013 were significant, but they were also limited: the Board agreed to calculate, at an earlier time and regardless of suitability for parole, inmates' base terms — something that the Board's regulations anticipated at some point for most inmates subject to indeterminate sentences. Our conclusion might be different if the agreement reflected the parties' agreement regarding how the Board could comply, for example, with a responsibility to implement judicially-recognized constitutional principles in undertaking statutory parole determinations. But it is clear that the settlement agreement emanated from the then-existing statutory and regulatory structure and embodied, at best, an agnostic reading as to whether base terms had legal significance outside of that structure. The agreement expressly defines "base term" and "adjusted base term" by reference to the regulations that imbued those terms with legal significance. These regulations in turn reference section 3041, the statute that Senate Bill No. 230 amended. (See, e.g., Cal. Code Regs., tit. 15, § 2400 ["This article implements Penal Code section 3041"].) By citing these regulations, the settlement evinces an agreement that base terms have legal significance because they were pivotal in determining release dates for

---

[12] For example, youth offenders are exempt from Senate Bill No. 230's requirement that inmates found suitable for parole nonetheless serve a statutorily-prescribed minimum sentence. (See § 3046, subd. (c).)

16

indeterminately-sentenced inmates. And advising inmates of their base terms had the salutary rehabilitative effect of informing each inmate of his or her earliest possible release date, if found suitable for parole.

This review of the settlement agreement readily showcases how base terms were relevant in the settlement agreement for a specific reason. To wit: they were relevant in the existing regulatory structure. Indicia from the agreement, as well as the contemporary statutory and regulatory scheme, reveal that the settlement relied on base terms having legal significance within that framework. Specifically, an inmate's calculated release date commenced with his or her adjusted base term, as contemplated in the settlement agreement. When that agreement was drafted, the Board was required by statute to set a provisional "parole release date" founded on "criteria" that would "provide uniform terms" for similar offenses. (Former § 3041, subd. (a).) The Board implemented that statutory mandate by promulgating regulations requiring the calculation of a base term, using a matrix that measured the seriousness of the offense and adjusted for aggravating or mitigating circumstances. (*Dannenberg*, *supra*, 34 Cal.4th at p. 1078 [noting that the Board promulgated base term calculations "[i]n response" to section 3041's "requirements"].) The Board's policy was to calculate the base term not before parole eligibility, but after he or she was found suitable for parole. The settlement agreement, however, changed the timing of an inmate's base term calculation to his or her initial parole hearing or at his or her next scheduled hearing if the initial hearing had already occurred. What the settlement agreement did not alter is the Board's underlying statutory and regulatory duty to calculate base terms.

That base terms had some role to play in the sentencing regime strikes us as a "controlling fact[]" on which the injunction rested. (*Sontag Chain Stores*, *supra*, 18 Cal.2d at p. 95.) Postsettlement legal changes make that controlling fact no

17

longer true. Base terms lack defined statutory significance — and informing inmates of their base terms no longer has an obvious rehabilitative purpose because those terms no longer control the release dates for inmates found suitable for parole. Put another way, the settlement agreement presupposes that base terms form part of the framework for parolee release date calculations. As a result of the changes described above emphasizing the centrality of public safety considerations, base terms are no longer part of that framework. We therefore conclude that the changes in the law constitute a material change in the stipulated order. And we think that this change is sufficiently material to raise substantial doubts as to whether the injunction continues to be "necessary or desirable." (*Union Interchange*, *supra*, 52 Cal.2d at p. 604.)

In holding that the postsettlement changes were not material, the Court of Appeal focused on whether the stipulated settlement "conflict[ed]" with the new legal regime. What this approach ignores is that Code of Civil Procedure section 533 provides for modification of an injunctive order not only in instances of conflict but also upon a "material change in the facts." The state's parole regime has changed significantly enough to warrant relieving the Board of its obligations, even in the absence of a direct conflict between the settlement and current law. (See *Sontag Chain Stores*, *supra*, 18 Cal.2d at p. 95 [whether to modify an injunctive order "is determined by the facts and circumstances of each particular case"].) The Court of Appeal erred in failing to recognize that the modified parole regime warranted modification of the injunctive order. A "disposition that rests on an error of law constitutes an abuse of discretion." (*In re Charlisse C.* (2008) 45 Cal.4th 145, 159.) In this case, postsettlement developments altering the parole regime were significant enough to constitute a material change in the facts, requiring modification of the injunctive order.

18

We would be compelled to uphold the original injunction if constitutional considerations required the Board to calculate inmates' base terms. And indeed, the Court of Appeal also based its ruling on the motion to modify the injunction on the theory that base terms are necessary to "assure life prisoners will not suffer constitutionally excessive punishment." What we nonetheless find is that, notwithstanding the importance of judicially-articulated constitutional considerations relevant to the Board's functions, there is no constitutional basis to require continued adherence to the injunctive provisions obligating the Board to calculate base terms. We thus hold that the Court of Appeal also abused its discretion in ordering the Board to continue calculating base terms as a constitutional requirement.

An inmate serving an indeterminate sentence has a constitutional right to a sentence not disproportionate to his or her offense. (See *In re Lynch* (1972) 8 Cal.3d 410, 424; *Solem v. Helm* (1983) 463 U.S. 277, 284-288.) Writing during a time when California imposed indeterminate sentences for most felonies, we noted that the "oft-stated rule that a prisoner has no right to a term fixed at less than maximum . . . is . . . subject to the overriding constitutionally compelled qualification that the maximum may not be disproportionate to the individual prisoner's offense." (*In re Rodriguez* (1975) 14 Cal.3d 639, 652). To guard against disproportionate punishment, *Rodriguez* required the parole authority to set a maximum term of incarceration for each inmate, based on the inmate's culpability (as measured by the circumstances of the offense). (*Ibid.*) *Rodriguez* required that the parole authority release inmates once they reached their maximum term, even if the authority had not found the inmate suitable for parole. (*Ibid.*) Butler relies on *Rodriguez* to argue that the state Constitution requires the Board to continue setting inmates' base terms, even after the postsettlement changes.

19

Under the cruel or unusual punishment clause (art. I, § 17) of the California Constitution, there is no question that an inmate sentenced to an indeterminate term cannot be held for a period grossly disproportionate to his or her individual culpability. (*Dannenberg*, *supra*, 34 Cal.4th at p. 1096.) Still, in *Dannenberg* we explained that *Rodriguez*'s prophylactic measures are not necessarily required in the state's current, mostly determinate sentencing regime. (*Id.* at p. 1097.) The petitioner in *Dannenberg* relied on *Rodriguez* to make a similar argument to the one Butler advances now. (*Id.* at p. 1096 ["Dannenberg contends . . . that such constitutional considerations impose upon the Board a general obligation to fix actual maximum terms, tailored to individual culpability, for indeterminate life inmates"].) Such a requirement, we explained, was necessary in a largely indeterminate sentencing regime — a regime that "imposed life maximums for a wide range of offenses, serious and less serious." (*Ibid.*) But it was *not* constitutionally required for the "narrower category" of serious offenders who receive indeterminate sentences under current law. (*Id.* at p. 1097.) Because of their culpability, there is a "diminish[ed] possibility" that these serious offenders will suffer constitutionally excessive punishment. (*Ibid.*) We also emphasized that inmates may bring their claims directly to court through petitions for habeas corpus if they "believe, because of the particular circumstances of their crimes, that their confinements have become constitutionally excessive as a result." (*Id.* at p. 1098.)

*Dannenberg* declined to construe the state Constitution as requiring the Board to set maximum terms, across the board, for the serious offenders currently subject to indeterminate sentences. For good reason: To do otherwise would have effectively undone, without sufficient constitutional justification, the legislative design associated with limited continued use of indeterminate sentences in California for a circumscribed group of offenders. Although *Dannenberg* did not

20

weaken the constitutional requirement against grossly disproportionate sentences, it made clear that our prior ruling in *Rodriguez* imposing on the Board a general duty to fix maximum terms for indeterminate sentences was motivated by the more "comprehensive indeterminate sentencing system" that was in effect at that time. (*Dannenberg*, *supra*, 34 Cal.4th at p. 1096.) The mostly determinate sentencing regime now in effect reflects the Legislature's design to reduce the number of offenders receiving indeterminate sentences, thereby limiting the possibility that these serious offenders will suffer constitutionally excessive punishment. (*Id.* at p. 1097.)

Given these changes, we see no reason to nonetheless enshrine base terms as constitutionally required. The Board promulgated base term regulations in response to the Legislature's instruction to establish "criteria" that would promote sentence uniformity for inmates serving lifetime sentences. (*Dannenberg*, *supra*, 34 Cal.4th at pp. 1078-1079.) The Board may not, however, release an inmate until the individual no longer poses a threat to "public safety," regardless of any base term calculation. (*Id.* at pp. 1083-1084.) In fact, we specifically instructed the Board to "eschew term uniformity" if public safety considerations warrant a sentence that went beyond a calculated base term. (*Id.* at p. 1083, italics omitted.) Thus, base term calculations were designed to set forth an inmate's *minimum* sentence, not to reflect the maximum sentence permitted by the Constitution.[13]

Nor do base terms function, in a system focusing parole determinations on public safety considerations, as a workable measure of constitutional proportionality. A sentence violates the prohibition against unconstitutionally

_____

[13]   In its July 27, 2016 order denying the motion to modify the stipulated agreement, the Court of Appeal also recognized that base terms do not represent inmates' maximum terms of incarceration (acknowledging that "the base term no longer represents the maximum term that can actually be imposed on a life prisoner").

21

disproportionate sentences only if it is so disproportionate that it "shocks the conscience." (*In re Lynch*, *supra*, 8 Cal.3d at p. 424.) Courts engage in a broad, fact-specific inquiry when assessing constitutional proportionality claims, considering the "totality of the circumstances surrounding the commission of the offense." (*People v. Dillon* (1983) 34 Cal.3d 441, 479.) Calculating base terms, in contrast, is best understood as an exercise designed to promote sentencing uniformity in the absence of other safeguards. (*Dannenberg*, *supra*, 34 Cal.4th at pp. 1078-1079). And the two-factor matrix method used to calculate a base term, for example, does not significantly address factors relating to the offender, such as "his age, prior criminality, personal characteristics, and state of mind." (*Dillon*, *supra*, 34 Cal.3d at p. 479.) Calculating a base term does not serve as a judgment on constitutional proportionality. Moreover, the Board has discretion to *increase* the length of terms set forth in a base term calculation based on policy considerations. (*Dannenberg*, *supra*, at p. 1094, fn.15.) So a base term calculation is, at best, ill-suited to serve as a measure for assessing a sentence's constitutional proportionality.

Butler urges us to eschew *Dannenberg*'s reasoning because its interpretation construed the prior version of section 3041. Butler is indeed correct that much of the opinion discusses language in former section 3041, subdivision (a) that Senate Bill No. 230 excised. (*Dannenberg*, *supra*, 34 Cal.4th at pp. 1078-1095.) But the aforementioned passages from *Dannenberg* are present in a different portion of the opinion, addressing a distinct constitutional argument that does not depend on the validity of section 3041's previous incarnation. (*Id.* at pp. 1096-1098.) What we considered in that portion of the opinion was whether the state Constitution required the Board to measure each inmate's culpability for the purpose of guarding against unconstitutionally excessive punishment. We answered in the negative, at least for a regime where only a subset of defendants

22

are allocated indeterminate sentences. The postsettlement changes to section 3041, subdivision (a) have not undermined the force of that aspect of the opinion.

In effect, California's current and mostly determinate sentencing laws, along with statutory reforms to the parole process, have all but rendered specific base term calculations for individuals subject to parole determinations unnecessary as a means of ensuring against unconstitutionally excessive punishment. Plainly, defendants retain the ability to perform the base term calculation or something equivalent and submit it to the Board for consideration. Moreover, the Board retains responsibility to take account, in its parole determinations, of public safety concerns that a base term calculation could have illuminated. (See Cal. Code Regs., tit. 15, § 2281, subd. (a) [explaining that the standard for parole suitability is whether "the prisoner will pose an unreasonable risk of danger to society if released from prison"].) For example, the Board was required, in calculating base terms for certain life offenses, to consider factors such as the crime's "threat to the public," as well as mitigating or aggravating circumstances. (Cal. Code Regs., tit. 15, § 2403, subd. (g).) But it can take account of such concerns without calculating base terms.

## III.

The settlement agreement approved by the parties in 2013 required the Board to calculate an inmate's base term at his or her initial parole hearing. At the time the parties ratified that agreement, a calculated base term directly impacted the release date for inmates serving indeterminate life sentences. Not so today. Instead, the release date for indeterminately-sentenced adult inmates — like Butler — is now guided by the date when an inmate has served the statutory minimum term and is found suitable for parole based on statutory public safety-related criteria, subject to limited exception. These changes to California's criminal justice system do not diminish the societal interest in avoiding arbitrary parole determinations. They do, however, dictate that base terms no longer directly control the release date for prisoners subject to indeterminate sentences. That these statutory changes are material to these parties' agreement requires, legally and practically, modification of the injunctive order by the Court of Appeal. Moreover, sentencing in California involves primarily determinate sentences and parole determinations involving public safety considerations — so specific base term calculations are not a constitutionally necessary measure for guarding inmates serving indeterminate sentences against disproportionate punishment.

We reverse the judgment of the Court of Appeal and order the settlement agreement modified so that the Board of Parole Hearings is relieved of its obligations to calculate base terms and adjusted base terms.

CUÉLLAR, J.

WE CONCUR:

CANTIL-SAKAUYE, C. J.
CHIN, J.
CORRIGAN, J.
LIU, J.
KRUGER, J.
RUBIN, J.[*]

---

[*] Associate Justice of the Court of Appeal, Second Appellate District, Division Eight, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

24

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** In re Butler

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 236 Cal.App.4th 1222
**Rehearing Granted**

_____

**Opinion No.** S237014
**Date Filed:** April 2, 2018

_____

**Court:** Superior
**County:** Alameda
**Judge:** Larry J. Goodman

_____

**Counsel:**

Keker & Van Nest, Keker, Van Nest & Peters, Jon B. Streeter, Susan J. Harriman, Benita A. Brauhmbhatt, Sharif E. Jacob, Steven A. Hirsch and Andrea Nill Sanchez for Petitioner Roy Thinnes Butler.

Heidi L. Rummel, Michael J. Brennan, Anna Faircloth Feingold and Rebecca Brown for USC Gould School of Law Post-Conviction Justice Project as Amicus Curiae on behalf of Petitioner Roy Thinnes Butler.

William Vogel and Aubrey Grant as Amici Curiae on behalf of Petitioner Roy Thinnes Butler.

Kamala D. Harris and Xavier Becerra, Attorneys General, Edward C. DuMont, State Solicitor General, Gerald A. Engler, Chief Assistant Attorney General, Jennifer A. Neill and Phillip J. Lindsay, Assistant Attorneys General, Aimee Feinberg, Deputy State Solicitor General, Samuel P. Siegel, Associate Deputy State Solicitor General, Claudia H. Amaral, Amber N. Wipfler, Sara J. Romano and Brian C. Kinney, Deputy Attorneys General, for Respondent the People.

Mark Zahner; and Richard J. Sachs, Deputy District Attorney (San Diego) for California District Attorneys Association as Amicus Curiae on behalf of Respondent the People.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Sharif E. Jacob
Keker, Van Nest & Peters
633 Battery Street
San Francisco, CA  94111-1809
(415) 391-5400

Aimee Feinberg
Deputy State Solicitor General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
(415) 703-5255