Filed 4/5/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| In re WILLIAM M. PALMER II, on Habeas Corpus. | A154269<br><br>(Riverside County<br>Super. Ct. No. CR29074) |
|---|---|

William Palmer, serving a sentence of life in prison with the possibility of parole, filed this petition for writ of habeas corpus to challenge his continued incarceration for a crime committed in 1988 as cruel and unusual punishment under article 1, section 17, of the California Constitution and the Eighth Amendment to the United States Constitution. Such challenges based on the length of prison time already served are rare:  Most claims of constitutionally excessive punishment challenge sentences when first imposed, looking prospectively at the time the offender *will* serve.  Such challenges rarely succeed, as courts generally defer to determinations of the punishments appropriate to particular offenses made by legislative representatives of the People.  Indeterminately sentenced inmates, however, serve terms whose length is fixed not by the Legislature but by the decisions of the Board of Parole Hearings (Board) as to whether and when the prisoner has become "suitable" for release on parole.  As will be seen, the serial denials of parole Palmer experienced resulted in punishment so disproportionate to his individual culpability for the offense he committed, that it must be deemed constitutionally excessive.

## BACKGROUND

Palmer's incarceration began in 1988, when, at age 17, he pled guilty to kidnapping for robbery and was sentenced to life with the possibility of parole.  He

1

became eligible for parole in 1996 and, over the next 19 years, had 10 parole suitability hearings at which parole was denied. The present petition was filed against the backdrop of ongoing litigation challenging the denial of parole at a hearing in 2015: We initially granted Palmer's petition for writ of habeas corpus on a ground that was subsequently rejected by the California Supreme Court in *In re Butler* (2018) 4 Cal.5th 728 (*Butler*), then subsequently granted the petition on the alternative ground we had originally not addressed. (*In re Palmer* (Sept. 13, 2018, A147177).) The Supreme Court granted review on January 16, 2019, and ordered the Reporter of Decisions not to publish our opinion. (*In re Palmer* (Jan. 16, 2019, S252145).) The case remains pending in the Supreme Court.[1]

Palmer filed the present writ petition on May 11, 2018, shortly after the Supreme Court issued its decision in *Butler* and before it directed us to reconsider our initial decision on Palmer's first petition. We issued an order to show cause on August 14, 2018, the Attorney General filed his return on September 24, and Palmer filed his traverse on October 24.

On December 6, 2018, the Board held a new parole suitability hearing as directed in our September 13, 2018 decision. This time, the panel found Palmer suitable for release on parole. We have been advised that he was recently released on parole.

---

[1] Palmer's 2015 writ petition alleged that the Board of Parole Hearings (Board) failed to comply with our decision in *In re Butler* (May 15, 2015, A139411) regarding the setting of his base term of imprisonment, and also failed to comply with a statutory mandate to give "great weight" to certain factors related to his having been a minor when he committed his crime. Our initial opinion granted the petition on the first of these grounds. The California Supreme Court granted the Attorney General's petition for review and subsequently transferred the case back to us with directions to vacate our opinion and reconsider the matter in light of *Butler, supra,* 4 Cal.5th 728, which reversed our *In re Butler, supra,* A139411 decision. We then turned to Palmer's alternative ground and agreed that the Board had failed to give "great weight" to youth offender factors as statutorily required.

## I.

Preliminarily, Palmer's release on parole does not render his petition moot because parolees remain in constructive state custody and are subject to constraints on their liberty. (*In re Wells* (1975) 46 Cal.App.3d 592, 596; *In re Sturm* (1974) 11 Cal.3d 258, 265.) As noted in *Berman v. Cate* (2010) 187 Cal.App.4th 885, 892, a parolee "is not free from legal restraint by the authorities" and "habeas corpus is the appropriate method for challenging the legality of the restraint." (*Id.* at p. 892; Pen. Code, § 1473, subd. (a).)[3]

Nor is Palmer's petition untimely, as respondent maintains. *In re Clark* (1993) 5 Cal.4th 750 (*Clark*), which set forth the procedural bars respondent relies upon, "explained that procedural rules barring delayed and successive writs 'are necessary both to deter use of the writ to unjustifiably delay implementation of the law, and to avoid the need to set aside final judgments of conviction when retrial would be difficult or impossible.' (*Clark*, . . . at p. 764.) Such rules 'are simply manifestations of this court's resolve to balance the state's weighty interest in the finality of judgments in criminal cases with the individual's right—also significant—to a fair trial under both the state and federal Constitutions.' (*In re Harris* (1993) 5 Cal.4th 813, 830.)" (*Gomez v. Superior Court* (2012) 54 Cal.4th 293, 308–309.) But "[c]ourts have not strictly applied *Clark's* formulation of the rules regarding timeliness and their limited exceptions to cases in which the habeas corpus petition does not attempt to collaterally attack the petitioner's conviction or sentence. (See *In re Espinoza* (2011) 192 Cal.App.4th 97 [petition challenging prison policies regarding visitation]; *In re Burdan* (2008) 169 Cal.App.4th 18 [petition challenging parole decision].)" (*Gomez*, at p. 309.)

---

[2] We have had several occasions to recite the facts related to Palmer's offense, prior background, and subsequent conduct in prison. We will discuss those facts as appropriate to discussion of his legal arguments.

[3] Further statutory references will be to the Penal Code unless otherwise indicated.

The concerns underlying the timeliness requirement certainly are not at issue in a habeas petition raising a claim of constitutionally excessive punishment *based on the length of time the inmate has already spent in prison*. As the *In re Burdan* court noted in the context of a challenge to a decision denying parole, "[f]inality of the conviction . . . is not an issue," and "[t]he only one potentially prejudiced by a delay . . . is the inmate himself," for whom delay means remaining in prison for a longer time. (*In re Burdan, supra,* 169 Cal.App.4th at p. 31; see, *People v. Miller* (1992) 6 Cal.App.4th 873, 877 [claim of excessive punishment reviewable on habeas despite delay "because a defendant's delay in raising the issue of excessive sentencing 'works primarily to his own disadvantage' "].) We agree with Palmer's assertion that it would be absurd and unjust to bar "an inmate's challenge to his *continued incarceration* as unconstitutionally excessive cruel and unusual punishment" on the basis that it was brought "*too late into his confinement.*"[4]

_____

[4] Respondent's assertion of untimeliness is particularly inapt in the present case. Respondent suggests that Palmer should have raised his excessive punishment challenge, at the latest, when he challenged his 2015 parole denial. At that time, respondent argues, Palmer had served 27 years in prison and knew the five-year denial would result in him serving more than 30 years. Respondent thus appears to take the position that Palmer was required to decide in advance the point at which he would claim his prison term had become constitutionally disproportionate, and present this claim as soon as he realized he would in fact serve that length of time. This position ignores the difficulty faced by a prisoner serving an indeterminate life term. Historically, it was the absence of any yardstick by which to gauge the proportionality of a given inmate's sentence (within the permissible statutory range under the former indeterminate sentencing law) that led the California Supreme Court to require the Board to set a maximum term, based solely on the circumstances of the crime and not postconviction factors, to facilitate prisoners' ability to seek, and courts' ability to provide, meaningful review. (*In re Rodriguez,* (1975) 14 Cal.3d 639, 654, fn. 18 (*Rodriguez*); see *People v. Wingo* (1975) 14 Cal.3d 169, 182-183 (*Wingo*).) Although the view of this court was subsequently rejected by the California Supreme Court in *In re Butler* (2018) 4 Cal.5th 728, at the time of Palmer's 2015 parole hearing, we had explained that requiring the Board to set base terms of confinement based on individual culpability for a given offense played a similar role in defining the parameters of a constitutionally proportionate sentence, and Palmer's challenge to the parole denial in 2015 was based on the Board's failure to set his base term of confinement, as was then required by the Board's settlement in *In re Butler,*

4

Similarly, it is not reasonable to view the present petition as a successive, "piecemeal" presentation of a claim that was or should have been presented sooner. (*Clark, supra,* 5 Cal.4th at p. 774.) Palmer has never before argued that his term of confinement had become constitutionally excessive, and to say he is barred from doing so now because he could have done so before would be both illogical and unfair.

## II.

When a defendant challenges the imposition of a sentence as constitutionally excessive punishment, "[t]he judicial inquiry commences with great deference to the Legislature. Fixing the penalty for crimes is the province of the Legislature, which is in the best position to evaluate the gravity of different crimes and to make judgments among different penological approaches. (*Harmelin v. Michigan* [(1991)] 501 U.S. [957,] 998 (conc. opn. of Kennedy, J.); *People v. Dillon* [(1983)] 34 Cal.3d [441,] 477.) Only in the rarest of cases could a court declare that the length of a sentence mandated by the Legislature is unconstitutionally excessive. (*People v. Weddle* [(1991)] 1 Cal.App.4th [1190,] 1196–1197; *People v. Mora* (1995) 39 Cal.App.4th 607, 615–616.)" (*People v. Martinez* (1999) 76 Cal.App.4th 489, 494.)

Palmer presents a different question, as he challenges not the indeterminate life term to which he was sentenced but the actual term of years he was required to serve. The punishment for Palmer's offense, kidnapping for robbery, is not a legislatively specified number of years; it is simply "imprisonment in the state prison for life with the possibility of parole."[5] (§ 209.) The number of years an inmate actually serves under such a sentence is determined not by the Legislature but by the Board's decision whether to grant or deny release on parole. For indeterminately sentenced life prisoners, the Legislative direction is only that the Board "shall normally grant parole" unless

_____

*supra,* A139411. In other words, in the habeas petition respondent claims should have presented an excessive punishment challenge, Palmer was attempting to correct the Board's failure to provide him with the measure this court had said would facilitate just such a challenge.

[5] The punishment is life in prison *without* possibility of parole where the victim suffers bodily injury.

5

"consideration of the public safety requires a more lengthy period of incarceration for this individual." (§ 3041, subds. (a)(2) & (b)(1).) The Board decides whether to grant release on parole based on its determination of the prisoner's "suitability" for release (§§ 3041, 3041.5), a determination that focuses on the inmate's current dangerousness, and is largely governed by postconviction conduct and personal development. (*In re Stoneroad* (2013) 215 Cal.App.4th 596, 617.) The Board does not consider whether denial of an application for parole may result in constitutionally excessive punishment.

Our Supreme Court has recognized, however, that "even if sentenced to a life-maximum term, no prisoner can be held for a period grossly disproportionate to his or her individual culpability for the commitment offense. Such excessive confinement . . . violates the cruel or unusual punishment clause (art. I, § 17) of the California Constitution." (*In re Dannenberg* (2005) 34 Cal.4th 1061, 1096 (*Dannenberg*).) "The proportionality of a sentence turns entirely on the culpability of the offender as measured by "circumstances existing *at the time of the offense*." (*Rodriguez, supra,* 14 Cal.3d at p. 652, italics added.) Where an inmate's sentence is disproportionate to his or her individual culpability for the offense, the Supreme Court has acknowledged, **"**section 3041, subdivision (b) cannot authorize such an inmate's retention, *even for reasons of public safety*, beyond the constitutional maximum period of confinement." (*Dannenberg*, at p. 1096, citing *Rodriguez*, at pp. 646-656, italics added & *Wingo, supra,* 14 Cal.3d at pp. 175-183; accord, *Butler*, *supra*, 4 Cal.5th at p. 744.) "[I]nmates may bring their claims directly to court through petitions for habeas corpus if they 'believe, because of the particular circumstances of their crimes, that their confinements have become constitutionally excessive as a result.' " (*Butler,* at p. 745, quoting *Dannenberg* at p. 1098.) In this sort of challenge, deference to the legislatively prescribed penalty is no longer a relevant factor, as the *actual* term of years served is a function of the Board's

6

parole decisions, not the Legislature's determination of the appropriate penalty in this particular case.[6]

_____

[6] Prior to the enactment of the determinate sentencing law (DSL) in 1976, when almost all prisoners served indeterminate sentences, our Supreme Court expressed concern over the difficulty of assessing the constitutional proportionality of an indeterminate sentence when, as here, the offense encompassed a wide range of conduct. (*Rodriguez, supra,* 14 Cal.3d at p. 654, fn. 18; *Wingo, supra,* 14 Cal.3d at pp. 182–183.) In order to facilitate that assessment, the court required the Board to set a maximum term based solely on the circumstances of the crime. (*Rodriguez,* at p. 654, fn. 18.) The court has since held that under the DSL, constitutional considerations no longer imposed on the Board this "general obligation to fix actual maximum terms, tailored to individual culpability, for indeterminate life inmates," because once California "largely abandoned" indeterminate sentencing, only a "narrower category" of serious offenders receive indeterminate life terms. (*Butler, supra,* 4 Cal.5th at pp. 733, 745; *Dannenberg, supra,* 34 Cal.4th at pp. 1078, 1097.)

The absence of a maximum term by which to measure the proportionality of punishment visited on an indeterminately sentenced life prisoner is not an issue in the present case because Palmer's challenge is to his sentence as defined by the number of years he has already served. But it is worth noting that the character of the present California prison population raises some question whether indeterminate sentencing has been "largely abandoned." In December 2017, when reliable estimates were most recently made, our total prison population consisted of 130,263 inmates. Of that figure, 34,388 inmates (27,431 lifers and 6,957 third-strikers) were indeterminately sentenced life prisoners. (Cal. Dept. of Corrections and Rehabilitation, Offender Data Points (2017), Div. of Internal Oversight & Research, Offender Data Points (2017) Populations, p. 6.) In other words, over one-quarter (26.4%) of the total prison population are lifers, whose punishment is determined by the Board. The number of indeterminately sentenced prisoners now confined in California prisons is therefore now *twice* the size of the entire population of indeterminately sentenced prisoners in 1975, when *Wingo* and *Rodriguez* were decided, which was 17,296 inmates. (Bureau of Justice Statistics, U.S. Dept. of Justice, Historical Statistics on Prisoners in State and Federal Institutions, Yearend 1925-86 (May 1988) p. 12.) The statements in *Dannenberg* and *Butler* that the present sentencing regime "reflects the Legislature's design to reduce the number of offenders receiving indeterminate [life] sentences" with the possibility of parole and "thereby limit[] the possibility that these serious offenders will suffer constitutionally excessive punishment" (*Butler, supra*, 4 Cal.5th at p. 745; *Dannenberg, supra*, 34 Cal.4th at p. 1097), is hard to square with the large percentage of our prison population made up of indeterminately sentenced life prisoners. In 2016, that percentage, then 31.3 percent, was the highest in the nation and more than twice or thrice those of most other states. (Nellis

A sentence must be invalidated as unconstitutional under the California Constitution if it is " ' "grossly disproportionate to the defendant's individual culpability" ' " (*People v. Leonard* (2007) 40 Cal.4th 1370, 1427 (*Leonard*), quoting *People v. Dillon*, *supra*, 34 Cal.3d at p. 479 (*Dillon*)) or " ' " " 'shocks the conscience and offends fundamental notions of human dignity.' " ' " (*Leonard*, quoting *People v. Hines* (1997) 15 Cal.4th 997, 1078.)  Pursuant to the three techniques described in *In re Lynch* (1972) 8 Cal.3d 410 (*Lynch*), "[a] petitioner attacking his sentence as cruel or unusual must demonstrate his punishment is disproportionate in light of (1) the nature of the offense and defendant's background, (2) the punishment for more serious offenses, or (3) punishment for similar offenses in other jurisdictions." (*In re Nunez* (2009) 173 Cal.App.4th 709, 725.)

Under the first of the *Lynch* techniques, we examine the " 'nature of the offense and/or the offender, with particular regard to the degree of danger both present to society.' " (*Dillon, supra*, 34 Cal.3d at p. 479, quoting *Lynch, supra,* 8 Cal3d at p. 479.) We must consider "not only the offense in the abstract . . . but also 'the facts of the crime in question' " (*Dillon*, at p. 479, quoting *In re Foss* (1974) 10 Cal.3d 910, 919), " 'including its motive, the extent of the defendant's involvement in the crime, the manner in which the crime was committed, and the consequences of the defendant's acts.' " (*Leonard, supra,* 40 Cal.4th at p. 1426, quoting *People v. Hines, supra,* 15 Cal.4th at p. 1078.)

As we have previously described, Palmer committed his life offense in 1988.  His face covered with a ski mask, Palmer lay in wait in a parking garage in an apartment complex with which he was familiar (having previously committed burglaries there).  He had taken a bus to this location because he 'knew rich people lived there.'  Brandishing an unloaded .357-caliber revolver he had stolen in a previous burglary, Palmer confronted Randy Compton, and ordered him to turn over his wallet.  Compton said he did not have

---

et al., The Sentencing Project, Still Life:  America's Increasing Use of Life and Long-Term Sentences (2017) at p. 10.)

8

one, and Palmer 'spur of the moment' decided to ask if he had a bank card; Compton said he did, and Palmer ordered him to drive to an ATM and withdraw $200. When they arrived at the bank, Compton, an off-duty police officer, drew his gun and fired 15 rounds at Palmer, who was hit in the knee and fled. Palmer was captured shortly thereafter, waived his *Miranda* rights, and confessed to the crime in an account fully corroborated by Compton.

Respondent argues that a potential life sentence is not grossly disproportionate to the crime of kidnap for robbery, pointing out that "kidnapping is one of the most serious of all crimes." (*In re Maston* (1973) 33 Cal.App.3d 559, 563 (*Maston*).) It has been observed that "[b]y its very nature [kidnapping] involves violence or forcible restraint" (*ibid.*) and that transporting the victim poses "dangers, not inherent in robbery, that an auto accident might occur or that the victim might attempt to escape from the moving car or be pushed therefrom." (*In re Earley* (1975) 14 Cal.3d 122, 132.)

But the question here is not whether a life sentence for the offense of kidnapping for robbery is proportionate in the abstract. "[A] punishment which is not disproportionate in the abstract is nevertheless constitutionally impermissible if it is disproportionate to the defendant's individual culpability." (*Dillon, supra,* 34 Cal.3d at p. 480.) In *Rodriguez*, the California Supreme Court found that a potential life sentence for a conviction of committing a lewd and lascivious act upon a child was not constitutionally excessive because of the wide range of conduct within the ambit of the statute. (*Rodriguez, supra,* 14 Cal.3d at pp. 647–648.) The court recognized, however, that "the offense described in section 288 encompasses conduct for which life might be a permissible punishment in some cases but excessive in others" and found that the 22 years served by the defendant in that case was constitutionally excessive. (*Id.* at pp. 647, 653.) *Rodriguez* explained: "The offense committed here is by no means 'trivial,' but the method of its commission involved no violence and caused no physical harm to the victim. The episode lasted only a few minutes. No weapon was involved and petitioner attempted none of the dangerous offenses sometimes associated with violations of section 288." (*Id.* at pp. 654–655.)

9

Similar points apply to the present case. The offense was undoubtedly serious and traumatic for Compton. But it was of relatively short duration,[7] the distance travelled was short, Palmer intentionally used an unloaded gun to avoid the risk of hurting anyone,[8] and the only person in fact injured was Palmer, who was shot by Compton—by chance, an armed off-duty police officer. With respect to the danger posed by Palmer's conduct, the manner in which *this particular* kidnapping for robbery was committed was considerably less egregious than it might have been.

Under the first *Lynch* technique, " '[t]he court must also consider the personal characteristics of the defendant, including age, prior criminality, and mental capabilities.' " (*Leonard, supra,* 40 Cal.4th at p. 1426, quoting *People v. Hines, supra,* 15 Cal.4th at p. 1078.) Palmer was 17 years old when he committed his offense. Age has long been one of the variables recognized as bearing on whether punishment is proportional to an offender's individual culpability. (*Dillon, supra,* 34 Cal.3d at p. 479.) Its significance has become all the more apparent in light of current judicial and legislative recognition that "the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes." (*Miller v. Alabama* (2012) 567 U.S. 460, 472 (*Miller*); *Graham v. Florida* (2010) 560 U.S. 48; *Roper v. Simmon* (2005) 543 U.S. 551; §§ 3051, subd. (f)(1), 4801, subd. (c).) As the United States Supreme Court has explained, this recognition is based "not only on common sense—on what 'any parent knows'—but on science and social science as well." (*Miller,* at p. 471.) *Miller* noted scientific findings

---

[7] The episode lasted less than 20 minutes: The victim told the police he left his apartment for the garage at 9:05 p.m. and the police responded to the reported robbery at approximately 9:22 p.m.

[8] In *People v. Mendez* (2010) 188 Cal.App.4th 47, 50, 65 (*Mendez*), in finding a sentence of 84 years to life excessive for a juvenile tried as an adult and convicted of carjacking, assault with a firearm and multiple counts of second degree robbery with gang and firearm enhancements, the court noted that while Mendez increased the risk of injury or death by brandishing a loaded gun at several victims, he did not inflict physical injury or fire the weapon. Appellant's culpability is surely further reduced by his decision to use an unloaded gun.

the court had previously cited—of youths' "transient rashness, proclivity for risk, and inability to assess consequences"—and observed that evidence before the court indicated the "science and social science" supporting its conclusions about " 'differences between juvenile and adult minds' " had since "become even stronger." (*Id.* at pp. 471–472, fn. 5.)

The characteristics of youth that have been accorded constitutional significance with respect to culpability for crime last beyond legal majority into early adulthood. In accordance with *Miller* and related cases, the California Legislature enacted statutes that require the Board, at parole suitability hearings for "youth offenders," to "give great weight" to the diminished culpability of youth as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity of the prisoner in accordance with relevant case law (§§ 4801, subd. (c), 3051, subd. (d), (e)). These statutes apply to offenders who were *25 years of age* or younger at the time of the controlling offense. (§ 3051, subd. (a)(1), 4801, subd. (c).) Significantly, since first enacted, the youth offender statutes have increased the age of the offenders to whom they apply from 18 years, to 23 years, to the current 25 years. (Stats. 2015, ch. 471, § 1; Stats. 2017, ch. 674, §§ 1, 2.) The legislative history reflects awareness of scientific evidence that brain development continues beyond age 18—specifically, that "the prefrontal cortex doesn't have nearly the functional capacity at age 18 as it does at age 25." (Assem. Com. on Pub. Safety, analysis of Assem. Bill No. 1308 (2017-2018 Reg. Sess.) as amended Mar. 30, 2017.)[9] Thus, regardless of the specific crime at issue, juvenile offenders are

_____

[9] The committee report states: "According to the author, 'AB 1308 would align public policy with scientific research. This measure would expand eligibility of the youth parole hearing process to certain individuals who were 25 or under when they committed a crime for which they received a lengthy or life sentence for a youth offender parole hearing. Scientific evidence on adolescence and young adult development and neuroscience shows that certain areas of the brain, particularly those affecting judgement and decisionmaking, do not develop until the early-to-mid-20s. Research has shown that the prefrontal cortex doesn't have nearly the functional capacity at age 18 as it does at 25. The prefrontal cortex is responsible for a variety of important functions of the brain including: attention, complex planning, decisionmaking, impulse control, logical

11

categorically less culpable than adult offenders (*Miller, supra,* 567 U.S. at pp. 471–472; *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1371–1372), and "the chronological age of a minor is itself a relevant mitigating factor of great weight." (*Eddings v. Oklahoma* (1982) 455 U.S. 104, 116.) Palmer was only 17 years old when he committed the crime for which he was imprisoned, well within this category of juvenile offenders.

Moreover, "youth is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage." (*Eddings v. Oklahoma, supra,* 455 U.S. at p. 115.) Mitigating evidence of factors such as "a difficult family history" or "emotional disturbance" is therefore "particularly relevant" in the case of a juvenile offender. (*Ibid.*) In *Dillon*, *supra,* 34 Cal.3d 441, for example, the court emphasized the immaturity of the 17-year-old defendant in finding it constitutionally disproportionate to punish him for first degree murder and therefore reducing his sentence to that for second degree murder. (*Id.* at pp. 450, 488.) The defendant had set out with a group of friends, several armed with shotguns and defendant armed with a semiautomatic rifle, to rob a marijuana farm the defendant knew to be guarded by a man who had previously threatened to shoot him. (*Id.* at p. 451.) After one of the group accidentally fired a weapon, upon seeing the man approach with a shotgun, the defendant rapidly fired at him. (*Id.* at p. 452.) Finding a first degree murder sentence "excessive in relation to [the] defendant's true culpability," the *Dillon* court explained: "[A]t the time of the events herein defendant was an unusually immature youth. He had had no prior trouble with the law, and . . . was not the prototype of a hardened criminal who poses a grave threat to society. The shooting in this case was a response to a suddenly developing situation that defendant perceived as putting his life in immediate danger. To be sure, he largely brought the situation on himself, and with hindsight his response might appear unreasonable; but there is ample evidence that because of his

---

thinking, organized thinking, personality development, risk management, and short-term memory. These functions are highly relevant to criminal behavior and culpability.' " (Assem. Com. on Pub. Safety, Analysis of Assem. Bill No. 1308 (2017-2018 Reg. Sess.) as amended Mar. 30, 2017.)

immaturity he neither foresaw the risk he was creating nor was able to extricate himself without panicking when that risk seemed to eventuate." (*Id.* at p. 488.)

As we have previously described, Palmer was raised primarily by his mother. After the family moved from a low-income area to one with "predominantly wealthier kids," Palmer's self-esteem suffered and he committed crimes and used drugs in order to be accepted by his peers, "have the things that they had" and "do the things they were doing." He admitted his first offense, driving without a license, in July 1985. In February 1986, at age 15, he admitted a felony violation of section 288a, but later insisted he was not guilty of this offense; psychological reports indicate that Palmer acknowledged having observed masturbation by younger boys whom his mother was supervising in foster care, but he insisted he did not touch them as they alleged. He was placed on probation, which he then violated with two charges of robbery, burglary, and attempted burglary. Palmer committed the life offense after being fired from a job in Palm Springs that he had valued, explaining afterward that he needed money quickly, had no other way to get it because he could not find a friend to drive him to Palm Springs to pick up a paycheck, and considered selling drugs but thought it would be "easier to just take the money from someone else." At a parole hearing years later, Palmer called this a "poor decision."

A psychological report from 1988 stated that Palmer's "unstable family situation" and "chronic substance abuse" appeared to be factors contributing to his delinquency. Testing indicated he was "easily aroused by emotionally loaded situations" and "likely to respond in an impulsive and at times aggressive manner," had "poor behavior controls" and had "not identified with an adult male figure." According to one report, testing showed him to be a "self-serving, egocentric, assertive, forceful personality with sociopathic tendencies who lacks a strong internalized value system and sensitivity to other persons and who views the acquisition of money as the panacea for all of his problems," and "a self-conscious personality with narcissistic traits and strong affiliative and social needs for approval and dominance to compensate for underlying feelings of weak self-esteem and insecurity." Appellant stated at his 2013 parole hearing that while

13

he had been a "leader" in his old environment, after the move he "started at the bottom" and "did whatever it took to fit in," committing thefts and burglaries rather than working to get the things he wanted because his "low self-esteem" and "wanting to be accepted by others" overcame the values he had been raised with.

The impulsiveness, low esteem and need for social acceptance reflected in appellant's self-evaluation and others' evaluations of him is consistent with the United States Supreme Court's observations about juveniles' culpability compared to that of adults. "Inexperience, less education, and less intelligence make the teenager less able to evaluate the consequences of his or her conduct while at the same time he or she is much more apt to be motivated by mere emotion or peer pressure than is an adult. The reasons why juveniles are not trusted with the privileges and responsibilities of an adult also explain why their irresponsible conduct is not as morally reprehensible as that of an adult." (*Thompson v. Oklahoma* (1988) 487 U.S. 815, 835.)

The circumstances of Palmer's life offense "exemplify the ' "hallmark features" ' of youth—' "immaturity, impetuosity, and failure to appreciate risks and consequences" ' (*Franklin, supra,* 63 Cal.4th at p. 283, quoting *Miller, supra,* 567 U.S. at p. 477)—that diminish youth offenders' culpability. As a 17-year-old high school dropout, Palmer made an impulsive 'spur of the moment' decision to turn an attempted robbery with an unloaded gun into a kidnapping for robbery, during the course of which Palmer was shot by the victim. Years later at his 2013 parole hearing, Palmer reflected that asking the victim if he had a bank card "didn't make any sense. Because if you don't have a wallet, you don't have any credit cards in your [pocket], why would you have a bank card just sitting in your pocket? But later you have the time to figure that part out. But he said yes. And he had it in his car. So I said, Okay. Well, let's just all go to the—let's both go to the bank, and you can get it out and give me the money."

That Palmer, at the time, had no idea of the consequences of his conduct is demonstrated by his question to the police officer who waited with him at the emergency room: " 'What will I get for doing this, six months or a year in custody?' " As appellant points out, had he not made the on the spot decision to make Compton drive to the ATM,

14

he would have faced at most a sentence of seven years (five years for second degree robbery or three years for attempted robbery, plus a two-year firearm enhancement).[10] As with the defendant in *Dillon,* the characteristic immaturity and impulsiveness of youth is evident here. Palmer's crime was by no means trivial, but more than 30 years in prison is a consequence far out of proportion to the danger he posed or actual harm he inflicted as a 17 year old.

Respondent's assessment of the nature of the offender aspect of the *Lynch* analysis is devoid of any recognition of the significance of Palmer's youth at the time of the offense, or of any of the circumstances of his background other than his criminal conduct. Respondent argues that "[d]espite being 17, Palmer admittedly had a criminal, adult mind set," citing examples such as Palmer saying he committed the commitment offense because he needed money and getting it honestly had not worked out, telling his mother after his arrest that he had tried it one too many times, and telling a counselor, "I will make the change from a criminal to a law abiding citizen." Respondent fails to explain how such statements by a 17 year old demonstrate "adult" thinking rather than juvenile failure to appreciate and weigh consequences and exercise judgment in the face of perceived inequities and misguided desire to achieve social status. Similarly, respondent points to Palmer's admission of having committed a number of burglaries for which he was not caught as evidence of his culpability, but does not address the fact that these offenses were committed before Palmer was even 17 years of age, for the same misguided reasons as the commitment offense. To be sure, Palmer acted to achieve the

---

[10] Palmer's 1988 guilty plea itself could have been influenced by the same "hallmark features" of youth that reduced his culpability for the offense. (*Miller, supra,* 567 U.S. at p. 477.) As the United States Supreme Court has noted, "the features that distinguish juveniles from adults also put them at a significant disadvantage in criminal proceedings" (*Graham v. Florida, supra,* 560 U.S. at p. 78); *Miller* noted the possibility that a juvenile "might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys." (*Miller,* at p. 477.) Palmer entered a plea of guilty to the most serious offense with which he could have been charged.

15

goal of obtaining money, as respondent says, despite the consequences his action would have for Compton, but respondent ignores the possibility—supported by the science discussed above—that his conduct and mindset could reflect impulsivity and underdeveloped judgment and sense of responsibility rather than a necessarily entrenched criminal mindset.  The evaluations conducted in 1988 to which respondent points, which discuss Palmer's antisocial tendencies outweighing his motivation to improve, suffer the same flaw; these evaluations, of course, predate the relatively recent increased scientific and judicial recognition of the degree to which juvenile and adult brain function differs.[11]

---

[11] Although not directly relevant in the present case, as Palmer has now been released on parole, we have previously commented upon a similar lack of serious consideration of the diminished culpability of youth offenders by the Board.  (*In re Perez* (2016) 7 Cal.App.5th 65, 93 ["lip service" to consideration of statutory factors].)  The Board's published statistics raise some question as to how the Board applies the constitutional, statutory and scientific recognition of this diminished culpability to its parole suitability determinations, as youth offenders do not appear to have been granted parole more frequently than adult offenders.  According to the Board's "2017 Report of Significant Events," of 2,586 youth offender hearings scheduled by the Board in 2017, 458 resulted in parole being granted—17.7 percent.  (Board of Parole Hearings, 2017 Report of Significant Events (May 14, 2018) p. 1.)  This rate is not much different than the rate for adults during the same period:  Parole was granted in 457 of the 2,748 adult offender cases scheduled for hearing—16.6 percent.  Looked at conversely, 1,033 youth offenders were denied parole (about 40 percent), while 1,184 adult offenders were denied (43 percent).

Along similar lines, it has been noted that some of the factors viewed by the Board as tending to favor denial of parole, such as "a history of being abused and living in a criminogenic environment as a child," while "the law flowing from *Miller* is clear that a history of abuse, a criminogenic environment, and negative peer influence are mitigating factors in considering culpability and the appropriate sentence for a juvenile."  (Bell, A Stone of Hope:  Legal and Empirical Analysis of Juvenile Lifer Parole Decisions (2018), forthcoming in Harvard Civil Rights-Civil Liberties L.Rev., vol. 54; Corrections & Sentencing L. & Policy eJournal, p. 75 (Corrections & Sentencing) <https:// papers.ssrn.com/sol3/papers.cfm? Abstract _id=3228681> [as of Apr. 5, 2019].)  An empirical study of 426 parole decisions among juvenile lifers in California found that "[a] history of abuse, trauma, or other instability in childhood was cited as a reason supporting the denial of parole in fifty-nine percent of the Board's decisions to deny parole."  (Corrections & Sentencing, at p. 76.)

It is telling that Palmer did not remain in prison for 30-plus years because of any assessment that his culpability for the crime he committed warranted such lengthy incarceration.[12] Palmer became eligible for parole over 20 years ago. As we have described in our prior opinions, he was subsequently denied parole not because of the seriousness of his offense or criminal history, or even because of violent conduct in prison[13] (which would not, in any case, bear on the proportionality of his punishment), but because of minor disciplinary issues seen as bearing on his judgment and impulse control.[14]

We are convinced that in light of Palmer's age at the time of the offense and attendant diminishment of his culpability, and the facts that he attempted to minimize the danger he posed by using an unloaded weapon and did not physically injure his victim, that his continued incarceration has become so disproportionate to his individual culpability as to be "constitutionally excessive." (*Butler, supra,* 4 Cal.5th at p. 745.)

As any one of the three *Lynch* factors may be sufficient to demonstrate the disproportionality of a sentence (*Mendez, supra,* 188 Cal.App.4th at pp. 64–65; *In re Nunez, supra,* 173 Cal.App.4th at p. 725), our analysis need not go further. The second *Lynch* technique, however, strikingly demonstrates the disproportionality of the punishment Palmer has suffered.

---

[12] The Board set Palmer's adjusted base term of confinement—determined pursuant to a biaxial matrix presenting factors related solely to the manner in which his crime was committed and harm done to the victim (Cal. Code Regs., tit. 15, § 2282, subd. (c))—at 12 years. Although the California Supreme Court has determined that base term calculations are not constitutionally required (*Butler, supra,* 4 Cal.5th 728), this calculation is nevertheless a useful indication of the Board's view of the seriousness of Palmer's crime as compared to other kidnappings for robbery.

[13] The record reflects only one physical altercation in prison, which occurred in 1990.

[14] The most recent of these was in 2014, when, in the visiting room, Palmer gave his girlfriend the shirt he wears when he paints; the other violation discussed at the parole hearing in 2015 occurred in 2012, when Palmer was cited for possession of a cell phone that he said he used to speak with his family after his mother died.

This technique compares the challenged punishment with punishment prescribed by California law for more serious offenses.  Palmer offers various examples of crimes more serious in terms of dangerousness, resulting harm and/or moral reprehensibility for which the maximum prison term is less than half the 30 years he has already served. These include:  11 years for voluntary manslaughter (unlawfully killing a person without malice, upon a sudden quarrel or heat of passion) (§ 193, subd. (a)); eight years for mayhem (unlawfully and maliciously maiming, disabling or disfiguring a person) (§§ 203, 204); 12 years for assault with a machine gun (§ 245, subd. (a)(3)); six years for assault with intent to commit mayhem, rape, sodomy or oral copulation (§ 220, subd. (a)(1)); four years for assault with caustic chemicals or flammable substances (§ 244); seven years for shooting at an inhabited building or vehicle (§ 246); five years for poisoning or adulterating food, drink, medicine, pharmaceutical product, or water supply (or eight years if involving use of substance that may cause death if ingested or that causes great bodily injury) (§ 347, subd. (a)); 13 years for rape of a child under 14 years of age (§ 264, subd. (c)(1)); or 14 years if acting in concert with another person (§ 264.1, subd. (b)(1)); 11 years for rape of a minor over 14 years of age (§ 264, subd. (c)(2)).

Respondent takes the view that comparing sentences for "unlike" crimes is not helpful because " '[t]he selection of a proper penalty for a criminal offense is a legislative function involving an appraisal of the evils to be corrected, the weighing of practical alternatives and responsiveness to the public will.' (*In re Lynch, supra,* 8 Cal.3d at p. 423.)"  Minor discrepancies from the actual wording of this passage aside,[15] the *Lynch* court was simply acknowledging that because "it is the function of the legislative branch to define crimes and prescribe punishments" (*id.* at p. 414), the judiciary "should not interfere in this process unless a statute prescribes a penalty 'out of all proportion to the

---

[15] The precise language *Lynch* used was this:  "The choice of fitting and proper penalties is not an exact science, but a legislative skill involving an appraisal of the evils to be corrected, the weighing of practical alternatives, consideration of relevant policy factors, and responsiveness to the public will; in appropriate cases, some leeway for experimentation may also be permissible." (*Lynch*, *supra,* 8 Cal.3d at p. 423.)

offense' [citation], i.e., so severe in relation to the crime as to violate the prohibition against cruel and unusual punishment." (*Id.* at p. 424.)

Respondent urges that a comparison with the sentence for kidnap for robbery with injury compels the conclusion that Palmer's sentence was not excessive. Whereas Palmer was sentenced to life imprisonment with the possibility of parole, the statute under which he was convicted and sentenced calls for a sentence of life *without* possibility of parole where the victim "suffers death or bodily harm, or is intentionally confined in a manner which exposes that person to a substantial likelihood of death." (§ 209, subd. (a).)

Respondent relies upon *Maston*, *supra*, 33 Cal.App.3d 559, which rejected a defendant's argument that his mandatory sentence of life without possibility of parole for kidnap for robbery with injury was grossly disproportionate because it was greater than the sentences prescribed for premeditated murder, robbery where the perpetrator kills but does not kidnap the victim, or rape where the perpetrator kidnaps and injures but does not rob the victim. According to respondent, because a victim sustaining lacerations requiring stitches has been held sufficient to constitute the bodily injury supporting a conviction for kidnap with robbery with injury (*People v. Dacy* (1970) 5 Cal.App.3d 216, 220), and a sentence of life without possibility of parole has been upheld as constitutional punishment for this offense (*Maston,* at p. 566), Palmer's sentence must also be constitutional because "the only difference is the victim miraculously surviving physically unscathed."[16]

---

[16] We are perplexed by Palmer's assertion that life without possibility of parole is no longer the penalty for kidnapping for robbery with bodily harm. Palmer cites *People v. McKinney* (1979) 95 Cal.App.3d 712, 745, in which the court stated the following: "On October 12, 1975, and continuing until July 1, 1977, the statutory penalty for kidnapping to commit robbery with bodily harm was either death or life imprisonment without the possibility of parole. Effective July 1, 1977, Penal Code section 209 was amended to provide a penalty of life imprisonment with the possibility of parole, whether bodily harm was inflicted or not. (Stats. 1976, ch. 1139, § 136.5.)"

Contrary to the above, according to information available on the website of the California State Assembly Office of the Chief Clerk, the 1976 amendment to section 209

*Maston* reviewed the constitutionality of the penalty for kidnap for robbery with injury in the abstract; the court noted that the defendants "d[id] not claim disproportionate punishment in relationship to their individual offense," and that such a claim was "unavailable" to them on the facts—"[b]eyond abducting their victim, raping and robbing her they forcibly transported her for many miles and severely beat her." (*Maston*, *supra*, 33 Cal.App.3d at p. 565.) *Maston* acknowledged that the aggravated kidnapping statute "is part of an anomalous substructure of California penal law" under which "[p]remeditated kidnapping which injures but does not kill elicits a heavier penalty than premeditated murder" and a "robber who kills but does not kidnap retains hope of eventual parole" while one "who abducts and merely injures is deprived of that hope." (*Id.* at p. 564.) The court noted that these anomalies "acutely need legislative attention." (*Id.* at p. 565.) More importantly, for our purposes, *Maston* expressly commented that it was addressing the "maximum statutory punishment, not its fitness as applied to the individual offense and offender," and that "[u]nusual twists of fact occur where, for lack

cited in *McKinney* as reducing the punishment to life in prison *with* the possibility of parole regardless of whether the victim suffered injury (Stats. 1976, ch. 1139, § 136.5) in fact describes the punishment as death where the victim suffered death, life in prison *without* possibility of parole where the victim suffered bodily harm, and life *with* possibility of parole where the victim did not suffer death or bodily injury. (<https://clerk.assembly.ca.gov/sites/clerk.assembly.ca.gov/files/archive/Statutes/1976/76Vol3.PDF#page=3> [as of Apr. 5, 2019].) Section 209 was next amended in 1977; that version of the statute removed reference to the death penalty and provided for life imprisonment without possibility of parole where the victim suffered death or bodily harm and life imprisonment with the possibility of parole where the victim did not suffer such injury. (Stats. 1977, ch. 316, § 15; <https://clerk.assembly.ca.gov/sites/clerk.assembly.ca.gov/files/archive/Statutes/1977/77Vol1_Chapters.pdf#page=3> [as of Apr. 5, 2019].)

Under the version of section 209 in effect when Palmer committed his offense, as under the current version, the punishment was life imprisonment without possibility of parole where victim suffered death or bodily harm or was "intentionally confined in a manner which expose[d] such person to a substantial likelihood of death, or life with the possibility of parole where the victim did not suffer such injury. (Stats. 1982, ch. 4, § 1; <https://clerk.assembly.ca.gov/sites/clerk.assembly.ca.gov/files/archive/Statues/1982/82Vol1_Chapters.pdf#page=3> [as of Apr. 5, 2019].)

20

of a sentencing alternative, the offender's punishment is grossly disproportionate to the circumstances." (*Ibid.*)

*Maston*'s reasons for rejecting a facial excessive punishment challenge to the sentence of life without parole do not hold up when applied to the particular circumstances of the crime Palmer committed. *Maston*'s observation that "kidnapping is one of the most serious of all crimes" (*Maston, supra,* 33 Cal.App.3d at p. 565), is certainly true as an abstract principle, but in assessing Palmer's culpability for the offense he committed, the relevant question is what danger and injury he in fact subjected his victim to, not what danger, force and violence *may* be present in a kidnapping for robbery. *Maston* found that the "augmented" penalty for a kidnapping for robbery in which the victim is injured served a "rational" "legislative hope" that it "may in some cases prevent physical harm." (*Id.* at p. 563.) Here, of course, the augmented penalty is not at issue. More importantly, with respect to culpability in *this* case, Palmer used an unloaded gun in an effort to avoid inflicting injury. This fact also bears on *Maston*'s statement that "[b]y its very nature [kidnapping] involves violence or forcible restraint." (*Ibid.*) In using an unloaded weapon to compel his victim's compliance, Palmer clearly caused the victim to fear for his safety and life; the victim did not know the gun was not loaded. But compared to a similar offense committed with a loaded gun or other weapon capable of inflicting deadly injury, Palmer's intentional attempt to reduce the potential for injury obviously lessens his culpability. He could not have anticipated that his victim would be an off-duty police officer armed with his own weapon—and Palmer himself was the only person injured in the course of the offense. While the asportation element of the offense entailed an inherent risk of harm such as a traffic accident (*In re Earley, supra,* 14 Cal.3d at pp. 132–133), such harms did not materialize. "[T]he consequences of the defendant's actions inform the nature of the offense and are important in assessing the constitutional penalty the state may impose." (*In re Nunez, supra*, 173 Cal.App.4th at p. 726.)

*Maston* also reasoned that because kidnapping for robbery requires movement of the victim that is more than "incidental to the robbery" and increases the risk of bodily

21

harm, kidnapping for robbery "possesses elements of deliberation comparable to those of kidnapping for ransom," which the court described as "coldly planned deliberate schemes." (*Maston, supra,* 33 Cal.App.3d at p 563.) Regardless of the accuracy of that conclusion in general, in the present case, while the *robbery* component of Palmer's offense was obviously premeditated and planned, the *kidnapping* was not; it was a spontaneous response to the victim telling Palmer he did not have money.

Respondent's comparison to the penalty for kidnapping for robbery with bodily harm ignores the actual circumstances of Palmer's offense. Moreover, it has no relevance with respect to a juvenile offender: Whatever the constitutionality of section 209's augmented penalty for an adult offender, a juvenile offender cannot be subjected to a mandatory sentence of life without parole. (*Miller, supra,* 567 U.S. at p. 470.)[17]

Respondent makes no attempt to address the various offenses Palmer has identified that involve greater actual harm or risk of harm than the offense Palmer committed yet carry *maximum* terms of imprisonment far shorter than what Palmer has already served. Palmer understates the potential maximum penalties some of these offenses would carry by ignoring the additional sentence they would carry for a perpetrator using a firearm in commission of the offense. Even taking enhancement for firearm use into account, however, the 30-plus years Palmer has served greatly exceeds the maximum sentence possible for these offenses. Voluntary manslaughter is an unlawful killing of a human being (albeit without malice), but, with the maximum firearm enhancement, can be punished with no more than 21 years imprisonment; assault with a machine gun threatens extreme danger but subjects the perpetrator to no more than 22 years; rape of a child under age 14, with firearm use, carries a maximum of 23 years; poisoning a water supply with a potentially deadly substance could expose any number of

---

[17] Here, if Compton had been physically injured and Palmer sentenced to life without parole, that sentence would now be found unconstitutional. (*Miller, supra,* 567 U.S. at p. 470 [mandatory sentence of life without parole for juvenile violates Eighth Amendment]; *Montgomery v. Alabama* (2016) ___ U.S. ___, 136 S.Ct. 718, 729 [*Miller* retroactive].)

people to a mortal threat but can be punished with a sentence no longer than eight years, or 18 if a firearm were somehow used in such an offense.  Moreover, these are examples of sentences for *adult* perpetrators, and *maximum* enhancement sentences, which would be difficult to justify for an unloaded firearm.  Considering the far more serious effect of or danger posed by these offenses, a sentence of more than 30 years for an impulsive 17 year old's attempt to commit robbery by using an unloaded gun to force a man to drive to an ATM is so clearly disproportionate that it "shocks the conscience."  (*Dillon, supra,* 34 Cal.3d at p. 478.)

The third *Lynch* technique calls for comparison of Palmer's punishment that he would be subjected to in other jurisdictions for the same offense.  The assumption underlying an interjurisdictional comparison " 'is that the vast majority of those jurisdictions will have prescribed punishments for this offense that are within the constitutional limit of severity; and if the challenged penalty is found to exceed the punishments decreed for the offense in a significant number of those jurisdictions, the disparity is a further measure of its excessiveness.' "  (*People v. Martinez* (1999) 71 Cal.App.4th 1502, 1516, quoting *Lynch*, *supra*, 8 Cal.3d at p. 427.)

Aside from being unnecessary to our analysis (*Dillon, supra,* 34 Cal.3d at p. 487, fn. 38), an interstate comparison is also the least useful means of assessing proportionality in the present case because it is so difficult to determine what sentence a like crime—considering all circumstances related to the offense and offender—would receive in other jurisdictions.  The fact that—as will be discussed—many states authorize punishment of up to life in prison for a kidnapping in facially similar circumstances (i.e., for the purpose of robbery, with use of a firearm and without injury to the victim) is of limited significance without knowing whether and how such states would account for matters such as the facts that the firearm was not loaded and appellant was 17 years old.  In general, reliance upon an interstate comparison may be subject to the criticism leveled by respondent here, that even if California imposes the harshest penalty for a given offense, this does not necessarily demonstrate the penalty is constitutionally excessive.

23

(*People v. Martinez, supra*, 71 Cal.App.4th at p. 1516.)  Nevertheless, a few points are worth making.

Palmer has compiled information on the sentence prescribed for his offense in all 50 states, the accuracy of which respondent expressly declines to challenge, and we rely upon it for purposes of this discussion.  (See *Rodriguez, supra,* 14 Cal.3d at p. 656.) According to this information, the 30 years Palmer has spent in prison equals or exceeds the *maximum* sentence applicable to his offense (taking into account his use of a firearm) in 21 states.  Over half of these (12) impose a maximum of 20 years or fewer and five of which impose a maximum of 15 years or fewer.  These maximums are for sentences imposed on adults.  Thus, even without accounting for Palmer's youth—which, at the risk of tiresome repetition, is of crucial importance in analyzing his culpability for the offense—Palmer has already served a decade more than the longest term permitted for his offense in 12 states, and at least five years more than the longest permissible term in another five states.

Twenty-eight states permit a maximum penalty greater than 30 years for the offense of kidnapping for robbery, at least where a firearm is used.  In eight of these, the maximum is a term of years—35 years in one state, 40 years in two states, 45 years in two others, 50 in two, 60 in two, and 99 in two others.  Sixteen states allow up to a life sentence.  Notably, however, none of these states *require* imposition of the maximum permissible term.  Some allow a life term only in certain circumstances and otherwise specify a significantly lower sentence.  For example, in one state a life term can be imposed only if the court finds there are "substantial and compelling reasons justifying an exceptional sentence" (Wash. Rev. Code § 9.94A.535), and the standard sentencing range appears to be roughly five to seven years.  (Wash. Rev. Code, §§ 9.94A.510, 9.94A.515 [level X]).[18]  In another, the specified sentence is 11 to 40 years unless a unanimous jury

---

[18] Sentences in Washington are determined by reference to a grid based on the category of seriousness for the offense and an "offender score" based on various statutory factors.  For the category including Palmer's offense, the associated sentence range runs from a low of 51 months (four years three months) to a high of 198 months (16 years six

selects a life sentence. (Miss. Code Ann. §§ 97-3-53, 97-37-37(2).) Most of the states specify a range of permissible terms (e.g., five to 60 years) or a term of "up to" life. Among states prescribing a specific range, the minimum terms vary from a low of three (one state), five (six states) or six years (one state) to a high of 40 years (one state), with nine states in between, requiring minimum terms of 10 (two states), 15 (two states) or 20 years (five states). Unlike California, the states that permit sentences as long or longer than the term Palmer has served so far allow the actual length of the sentence for this offense to be determined as appropriate in an individual case—and appear to contemplate terms far short of 30 years in nonaggravated cases.

Respondent's argument that Palmer's information shows California is not out of step with the majority of the country is necessarily based on a comparison of maximum allowable sentences, not actual sentences imposed, and therefore misses the point. Another of respondent's arguments—that because many states permit sentences of life *without* parole for nonviolent offenses,[19] "California is not an outlier"—misses the point for a different reason. As we have said, no state can constitutionally impose a sentence of life without possibility of parole upon a juvenile offender. (*Miller, supra,* 567 U.S. at p. 470.) Respondent's attempt to demonstrate the proportionality of Palmer's sentence by comparing it to a sentence to which Palmer could not be subjected completely ignores "the circumstances existing at the time of the offense"—precisely the circumstances that are the measure of individual culpability and therefore constitutional proportionality. (*Rodriguez, supra*, 14 Cal.3d at p. 652.)

---

months). (Wash. Rev. Code, § 9.94A.510.) For purposes of this discussion, we have not attempted to verify Palmer's calculation of the appropriate offender score.

[19] Respondent relies upon a 2013 publication by the American Civil Liberties Union reporting that 22 states permit sentences of life without parole for nonviolent felonies, seven of them permitting such sentences for first-time nonviolent offenses, 15 mandating life without parole for certain nonviolent offenses and 19 allowing life without parole for nonviolent offenses pursuant to habitual offender laws. (ACLU, A Living Death: Life Without Parole for Nonviolent Offenses (Nov. 2013) at pp. 39, 74, 98 <www.aclu.org/sites/default/files/assets/ 111213a-lwop-complete-report.pdf> [as of Apr. 5, 2019].)

## III.

Palmer challenges his sentence under both the California Constitution and the Eighth Amendment to the United States Constitution. The test of proportionality under the latter, while stated slightly differently than the California one, considers the same factors. (*Mendez, supra,* 188 Cal.App.4th at p. 64.) "A court must begin by comparing the gravity of the offense and the severity of the sentence. [(*Harmelin v. Michigan, supra,*] 501 U.S. [at p.] 1005 (opn. of Kennedy, J.).) '[I]n the rare case in which [this] threshold comparison . . . leads to an inference of gross disproportionality' the court should then compare the defendant's sentence with the sentences received by other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions. [(*Ibid.*)] If this comparative analysis 'validate[s] an initial judgment that [the] sentence is grossly disproportionate,' the sentence is cruel and unusual. [(*Ibid.*)]" (*Graham v. Florida, supra,* 560 U.S. at p. 60.) Our analysis above would yield the same conclusions under the federal Constitution.

Respondent's argument that the Eighth Amendment challenge is foreclosed by *People v. Franklin* (2016) 63 Cal.4th 261 (*Franklin*) has no merit. The defendant in *Franklin*, sentenced to 50 years to life for a murder committed when he was 16 years old, argued the sentence violated the Eighth Amendment as the functional equivalent of a sentence of life without possibility of parole. (*Franklin*, at p. 268.) The California Supreme Court found the challenge moot in light of recently enacted legislation that would require parole consideration, with " 'great weight' " given to " 'the diminished culpability of juveniles as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity of the prisoner.' " (*Id.* at pp. 268, 277; §§ 3051, 4801, subd,. (c).) Because the youth offender parole statutes would provide "a meaningful opportunity for release no more than 25 years into [his] incarceration"— when he was 41 years old—Franklin's sentence was not the functional equivalent of life without parole and his claim of constitutionally excessive punishment was moot. (*Franklin*, at pp. 277, 279–280.)

26

It should be obvious that *Franklin* has no relevance to Palmer's constitutional claim, which does not challenge his original sentence, suggest his sentence is the functional equivalent of life without parole, or suggest his sentence will become excessive due to limitations on his eligibility for parole. His claim is that the number of years he has *already* served is constitutionally disproportionate to his culpability for his offense. *Franklin* has no bearing on this claim.

## IV.

As we have said, Palmer has been released from custody but remains in constructive custody under parole supervision. His petition argued he was entitled to release on his own recognizance because he had already served a constitutionally disproportionate term. The Attorney General's return denied there was a lawful basis on which to release Palmer on parole or on his own recognizance, but made no substantive response to Palmer's argument concerning constructive custody. At oral argument, the Attorney General relied on *In re Lira* (2014) 58 Cal.4th 573 *(Lira)* as authority for us to deny Palmer's request for release on his own recognizance. In response to our invitation for additional briefing on this point, the Attorney General argues that Palmer's habeas petition should be denied as moot because he has now been released from confinement. The Attorney General further argues that *Lira* precludes us from ordering that Palmer be released from parole, as well as from confinement in prison, and that eliminating Palmer's period of parole supervision would be contrary to his successful reintegration into society.

We disagree.

As earlier stated, Palmer's petition is unquestionably not moot, as he remains in constructive custody. (*In re Wells*, *supra*, 46 Cal.App.3d at p. 596, quoting *In re Sturm, supra,* 11 Cal.3d at p. 265; *Berman v. Cate, supra,* 187 Cal.App.4th at p. 892.) The cases upon which the Attorney General relies dealt with entirely different circumstances. *In re Ponce* (1966) 65 Cal.2d 341, 343, held that a challenge to the determination that the petitioner was a habitual criminal was moot because the legal effect of that determination was to make him ineligible for parole until he had served a minimum of nine years, and

he had already served that minimum term, been released on parole, and returned to prison for another crime. In *Weinstein v. Bradford* (1975) 423 U.S. 147, 148, an inmate's challenge to procedures governing the consideration of his eligibility for parole was found moot because the inmate had since been released not only from prison but from parole supervision. The Attorney General describes *Frias v Superior Court* (1975) 51 Cal.App.3d 919, 923 as holding that a petition requesting release was moot because the petitioner had been released, noting the court's statement that granting the petition would "result in nothing for petitioner." But the petition in *Frias* challenged the petitioner's being held in segregated custody; the "release" to which the court referred in finding the petition moot was release to the general prison population. (*Ibid.*) In all of these cases, courts found mootness where the particular restraint being challenged had been eliminated and no further relief was possible. None are authority for the proposition that a petition raising a claim of constitutionally excessive punishment is moot when the petitioner is released from physical custody but remains in constructive custody on parole.

*Lira,* which the Attorney General maintains precludes us from ordering that Palmer be released from parole supervision, is also inapposite. In that case, while a petition challenging the Governor's reversal of a parole grant was pending, the Board again granted parole; the Governor did not review this decision and the prisoner was released on parole. (*Lira, supra,* 58 Cal.4th at p. 577.) Subsequently, the habeas petition was granted, reversing the Governor's earlier decision, and the prisoner argued that the time he spent in prison between the Governor's erroneous reversal and his eventual release should be credited against his period of parole. (*Id.* at p. 578.) Rejecting this argument, *Lira* held (among other things) that the challenged period of imprisonment was not unlawful, and that the determination whether a parole period is required, as well as its duration and conditions, were matters for the Board with which a court could not interfere under the principle of separation of powers. (*Id.* at pp. 582–584)

The critical distinction between *Lira* and the present case, which the Attorney General ignores, is that the prisoner in *Lira* was never serving an unlawful sentence. We

28

have determined that Palmer was serving a prison sentence that had become constitutionally excessive. Unlike the situation in *Lira*, his continued imprisonment was *unlawful.* He is, therefore, "entitled to be freed from all custody, actual or constructive." (*In re Wells, supra,* 46 Cal.App.3d at p. 604.)

The Attorney General's invocation of the public interest in parole supervision to monitor and assist with Palmer's reintegration into society cannot supersede the effect of his having served a prison term that exceeded constitutional bounds. The Attorney General notes two of the conditions of Palmer's parole—that he participate in a transitional housing program for at least six months and that he attend a parole outpatient clinic. However well such conditions might serve both Palmer himself and the public, their existence as conditions of parole demonstrates that Palmer is not free from restraint. And these are only two of 29 "Special Conditions of Parole" that affect most aspects of Palmer's life. Some of these are patently punitive, at least in the circumstances of this case—such as "[y]ou shall not have contact with any minor male/female you know or reasonably should know is under the age of 18," "[y]ou shall not have contact with your biological or adopted children" and "[y]ou shall not date, socialize or form a romantic interest or sexual relationship with any person who has physical custody of a minor."[20] It is difficult to comprehend how his release under such conditions can be seen as anything other than continued restraint and punishment for his crime.

## DISPOSITION

Petitioner has already served a prison term grossly disproportionate to his offense. His continued constructive custody thus constitutes cruel and unusual punishment within the meaning of article 1, section 17, of the California Constitution and the Eighth Amendment to the United States Constitution. He is entitled to release from all forms of custody, including parole supervision.

---

[20] On our own motion, we take judicial notice of the "Notice and Conditions of Parole" signed by Palmer and prison staff on March 12, 2019, which was submitted to this court by Palmer as an exhibit to his letter brief filed March 21, 2019.

29

Respondent is directed to discharge petitioner from all forms of custody, physical and constructive, upon the finality of this opinion.

_____
Kline, P.J.

We concur:


_____
Richman, J.


_____
Stewart, J.


*In re Palmer II on Habeas Corpus* (A154269)

30

Counsel:

O'Melveny & Myers, Geoffrey H. Yost, Melody Drummond Hansen, Megan Havstad, Cara L. Gagliano, Micah Chavin for Petitioner.

Xavier Becerra, Attorney General, Phillip J. Lindsay, Senior Assistant Attorney General, Sara J. Romano, Supervising Deputy Attorney General, Denise A. Yates, Deputy Attorney General